UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MELISSA FLONES,

       Plaintiff,                              Case No. 2:11-cv-14416-VAR-PJK

v.                                          Hon. Victoria A. Roberts

BEAUMONT HEALTH SYSTEM, d/b/a
BEAUMONT HOSPITAL, GROSSE POINTE

       Defendant.

_____


**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


**CERTIFICATE OF SERVICE**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................................................. ii

CONTROLLING AUTHORITY ........................................................................................ iv

STATEMENT OF ISSUES PRESENTED.............................................................................v

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

STANDARD OF REVIEW ................................................................................................10

AGUMENT........................................................................................................................11

    I.    Plaintiff presented sufficient evidence to establish a claim
        of retaliation ..................................................................................................11

    II.    Defendant's explanation is pretext..............................................................15

    III.    Plaintiff has sufficient evidence of age discrimination to
         defeat summary judgment........................................................................19

CONCLUSION...................................................................................................................20

CERTIFICATE OF SERVICE ..........................................................................................21

## <u>INDEX OF AUTHORITIES</u>

### <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248 (1986) ...................................................................................10

*Brooks v. Davey Tree Expert Co.*,
  478 Fed Appx 934 (6th Cir., 2012)..........................................................4, 16, 18

*Clark v. City of Dublin*,
  178 Fed Appx 552 (6th Cir 2006).......................................................................14

*Cook v. CBS, Inc.*,
  47 Fed Appx 594, 596 (2nd Cir., 2002)...............................................................12

*Cooper v. City of N. Olmstead*,
  795 F2d 1265 (6thCir  1986) ...............................................................................14

*Cox v. Science Applications*,
  225 F3d 658 (6th cir., 2000) ...............................................................................14

*DiCarlo v. Potter*,
  358 F.3d 408, 414 (6th Cir.2004) ........................................................................19

*EEOC v. Avery Dennison Corp.*,
  104 F.3d 858, 861 (6th Cir.1997) ........................................................................11

*EEOC v. Freedom Adult Foster Care*,
  929 F Supp 256, 261 (ED Mich 1996)..................................................................19

*Ercegovich v. Goodyear Tire & Rubber*,
  154 F3d 344 (6th Cir., 1998) ...............................................................................20

*Farrell v. Planters Lifesavers Co.*,
  206 F3d 271 (3rd Cir., 2000) ...........................................................................12, 13

*Hamilton v. General Electric Corp*,
  556 F3d 428, 435 (6th Cir 2009) .........................................................................11

*Holmwood v. Pontiac Osteopathic Hospital*,
  2001 WL 1654775 (Mich App 2001) ....................................................................11

*Matras v. Amoco Oil*,
  424 Mich 675, 682 (1986) ...................................................................................19

*Matsushita Elec. Ind. Co. v. Zenith Radio*,
   475 U.S. 574, 587 (1986) ....................................................................10

*Nguyen v. City of Cleveland*,
   229 F 3d 559, 563 (6th Cir., 2000) ..............................................11, 12

*Reeves v. Sanderson Plumbing*,
   530 U.S. 133, 147 (2000)..........................................................4, 16, 20

*St. Mary's Honor Center v. Hicks*,
   509 U.S. 502, 511 (1993)....................................................................16

*Texas Board of Community Affairs v. Burdine*,
   450 US 248 (1981)..............................................................................15

*Wells v. Colorado Dept of Transportation*,
   325 F3d 1205 (10th Cir., 2003) ..................................................4, 12, 13

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564, 576 (6th Cir.2003) ...............................................4, 15, 19

*Wheeler v. McKinley Enterprises*,
   937 F 2d 1158, 1162 (6th Cir. 1991) ..................................................10

*White v. Baxter Healthcare*,
   533 F3d 381, 390 (6th Cir 2008) ......................................................11, 16

## **OTHER AUTHORITY**

29 USC §621, *et seq.*........................................................................................1

42 USC § 2000e, *et seq.*...................................................................................1

Fed. R. Civ. P. 56............................................................................................10

## <u>CONTROLLING AUTHORITY</u>

*Brooks v. Davey Tree Expert Co.*, 478 Fed Appx 934 (6th Cir., 2012)

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000)

*Wells v. Colorado Dept of Transportation*, 325 F3d 1205 (10th Cir., 2003)

*Wexler v. White's Fine Furniture, Inc.*, 317 F3d 564, 576 (6th Cir.2003)

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.      Whether Plaintiff presented sufficient evidence of age discrimination to

        demonstrate a genuine issue of material fact to be resolved by the jury.


II.     Whether Plaintiff presented sufficient evidence of retaliation to establish a

        *prima facie* case and demonstrate that Defendant's explanation is

        pretextual to create a genuine issue of material fact to be resolved by the

        jury.

## <u>INTRODUCTION</u>

This case arises out of the employment and subsequent termination of the Plaintiff Melissa Flones by the Defendant Beaumont Hospital on April 6, 2010, at the age of 61. Flones had been employed as a Certified Registered Nurse Anesthetist (CRNA) for more than 26 years with an unblemished record until shortly before her termination. Her termination occurred soon after Plaintiff filed a complaint of gender and age discrimination against her by her supervisors with Defendant's Human Resources department. Sadly, those complaints were never addressed at the time or when she claimed that her termination was in retaliation for the complaints.

Although Defendant claims that Plaintiff was terminated for failing to follow policy with regard to the transfusion of blood during a surgical procedure, this is simply pretext for Defendant's discriminatory and retaliatory motive as Plaintiff was following the same procedure that she and other CRNAs utilized in the operating rooms at Beaumont.[1] Specifically, Defendant claims that Plaintiff ordered and transfused blood during a surgical procedure without notice and approval of the surgeon. Yet documentation from the operating room indicates that the surgeon was aware of and approved the transfusion.

In her complaint filed on October 6, 2011, Plaintiff alleged that her termination was impermissibly based on her age and in retaliation for her complaints of age and gender discrimination in violation of the Age Discrimination in Employment Act, 29 USC §621, *et seq.* and Title VII of the 1964 Civil Rights Act of Michigan, 42 USC §2000e, *et seq.* Following discovery, Defendant filed a motion for summary judgment, alleging that there are no issues of

---

[1] Although Defendant claims that Plaintiff's actions violated state licensing guidelines, no such guidelines have been identified or introduced into evidence as part of this case. In fact, the State of Michigan concluded that Plaintiff had provided appropriate care, exercised good judgment and did not violate the Public Health Code (Exh 7).

fact.[2] A review of the factual record, viewed in the light most favorable to Plaintiff, and the applicable law, however, demonstrates that Plaintiff's claims are factually and legally supported. Summary judgment, therefore, is inappropriate and Defendant's motion should be denied in its entirety.

## STATEMENT OF FACTS

The Plaintiff, Melissa Flones, commenced employment with Bon Secours Hospital[3] in 1983 as a CRNA. (Exh. 1, Flones, p 9). As a CRNA, Plaintiff was assigned to an operating room area and was responsible for all the cases in that room. This entailed checking the anesthesia machine, interviewing the patient, inducing anesthesia, monitoring the patient during the procedure, waking the patient after the procedure and taking the patient to the recovery room. (*Id*, p 18).

Plaintiff worked under the supervision of an anesthesiologist who is a medical doctor. (*Id*, 18-9). The anesthesiologist, however, typically was responsible for up to four operating rooms at a time so the rooms are staffed by a CRNA under his or her direction. (Exh 5, Golinski, 76). Initially the anesthesiologist and the CRNA have a brief conference to discuss treatment prior to the start of the medical procedure. The anesthesiologist then administers the anesthesia and leaves the operating room. (Exh 2, Schreck, p 9). Depending on the procedure involved and stability of the patient, the anesthesiologist may not return to the operating room during the procedure. Because the operating room is a dynamic environment, flexibility is required for all medical personnel involved. As a result, the CRNA often administers medication and care without an order or explicit direction from the surgeon or the anesthesiologist. (Exh 1, Flones, p

---

[2] Defendant claims that Plaintiff admitted to engaging in the conduct for which she was disciplined. This is untrue as will be set forth in the statement of facts.
[3] That hospital was subsequently acquired by Beaumont Hospital. Plaintiff's employment continued under Beaumont Hospital until her termination.

40). This includes ordering blood, which is within the spectrum of practice of a CRNA (Exh 2, Schreck, p 21).

Throughout her employment, Plaintiff performed her duties to the satisfaction of the Defendant until 2010. (Exh 2, Schreck, p 10; Exh 3, Macon, p 8; Exh 4, Cardeccia, p 48). Although Plaintiff had been given an indication that her manager wanted to terminate her employment, Plaintiff dismissed the threats and concentrated on fulfilling her job duties. However, Plaintiff suddenly was subjected to discipline which was unwarranted and undeserved beginning in 2009.

The first sign of trouble occurred during Plaintiff's performance evaluation. Plaintiff received her evaluation from Mary Golinski, the Chief Nurse Anesthetist. During the review, Golinski questioned whether Plaintiff was "too old to work 16 hour shifts." (Exh 1, Flones, p154). When Plaintiff asked why Golinski was asking about her age and ability, Golinski claimed that her co-workers were complaining. However, Plaintiff was never given any details about her alleged failings and basis for the age biased comment. (*Id*, p 155)

Then, without warning, Plaintiff was disciplined for allegedly using her phone while providing patient care. (Defendant's Exh 2). The discipline, issued on November 30, 2009, apparently arose out of an occurrence in August 2009.[4] Plaintiff was assigned to a patient scheduled for an endoscopy. Although Plaintiff had connected the monitors, she was not providing any patient care because the doctor had not arrived.  Plaintiff and Dr. Macon, the anesthesiologist, had already explained the procedure to her. As a result, Plaintiff was not required to be in the room but she felt bad about leaving the patient in the room with the scopes so she offered to sit with the patient until the surgeon arrived. (Exh 1, Flones, p 22).  Since she

---

[4] Defendant claims this discipline emanated from a patient complaint. However the actual complaint has never been produced and the HR representative involved in the discipline never saw any patient complaint. (Exh 4, Cardeccia, p 35).

did not have any patient responsibilities, Plaintiff was checking a medical question on her smartphone.[5]  She was not playing any games, making telephone calls or texting. (Exh 1, Flones, p 25).

While Defendant contends that the Plaintiff's actions violated a policy of which Plaintiff was aware, that is incorrect. Plaintiff  did acknowledge that she was aware that using a phone  to text or make calls while providing patient care was prohibited, but she did not admit that using the reference function on a PDA while patient care was not be provided violated any rule. (Exh 1, Flones, p 25). In fact, Ms. Golinski, who issued the discipline, admitted that while she did not allow personal cell phone calls or text messaging, she may have allowed the use of personal devices to research or answer medical issues (Exh 5, Golinski, pp 24-5). That is all Plaintiff was doing here.

Plaintiff was issued a level one plan for performance improvement for this incident, discipline which far exceeded the crime even if it had been committed by Plaintiff. (Defendant's Exh 2). This is the second step in the Defendant's progressive discipline scheme. The first step in Defendant's progressive discipline policy is counseling which was skipped by Ms. Golinski. Yet no legitimate reason exists to skip that first step. According to Defendant's HR Director, when an employee commits a generalized mistake without intent, the progressive discipline policy should be followed (Exh 6, Woolsey, pp 28-9).

 While Plaintiff was issued a PPI, another CRNA, Ms. Huth, who was actually listening to her IPod with headphones on while giving anesthesia was only given a verbal counseling by Golinski (Exh 5, Golinski, p 26). So a CRNA who was actively involved in patient care was

---

[5] Plaintiff and other employees always had smartphones with them. These phones served multiple functions. For example employees could assess their calendar and work schedule from the phones if questions arose or adjustments needed to be made. Plaintiff also had an application through which she could do medical research. In fact, doctors and other employees often asked her to check information with the Hippocrates app that she had on her PDA. (Exh 1, Flones p 23).

using a personal device only received oral counseling while Plaintiff who was merely sitting in the room so the patient would not be alone prior to providing patient care received harsher discipline.

Even Defendant's HR representative, Brian Cardeccia, who signed the discipline given to Plaintiff questioned Golinski's decision. He admitted that if Plaintiff was not providing direct patient care and was only conducting research, the discipline issued merits further review. (Exh 4, Cardeccia, p 40). Unfortunately Cardeccia did not interview Plaintiff or see the complaint allegedly made by the patient. He just accepted Golinski's presentation of the facts because Golinski wanted Plaintiff written up (Exh 4, Cardeccia, p 40). Despite the fact that Plaintiff felt the discipline was unfair, she was not aware that she could not grieve the discipline.

In January 2010, Plaintiff was asked to do an epidural with Dr. Haas for a labor and delivery. (Exh 1, Flones, p 27). After Dr. Haas placed the epidural, they were infusing anesthetic for delivery using an infusion pump. (*Id*, p 29). The Plaintiff accidently picked up the wrong medication. Instead of the anesthesia, Plaintiff grabbed antibiotic penicillin. Although the medication was connected to the infusion pump, the patient had not received any of the antibiotics when Dr. Haas asked how much fentanyl was in the bag. To answer the questions, Plaintiff suggested that they look at the bag together.[6] This occurred within seconds of hooking up the bag so the mistake was quickly recognized and rectified before the patient received any of the medication. (*Id*).

---

[6] Contrary to Defendant's statement, Plaintiff knew what was in the bag.  She suggested that both she and Dr. Haas look at  the bag together because they has always been her practice and procedure whenever someone asked about medication or anesthesia that she gives to a patient. (Exh 1, Flones, p 33). There is no evidence in the record that Plaintiff did not know what was in the anesthesia bag.

Without obtaining Plaintiff's statement, Defendant, again through Mary Golinski, issued Plaintiff a Level II Performance Plan and a one day suspension.[7] Plaintiff served her suspension on February 2, 2010. Defendant reported the suspension to the State of Michigan. The State concluded that Plaintiff had no violated any public health policy and dismissed the complaint (Exh 1, Flones, p 43).

Shortly thereafter, in February 2010, Plaintiff learned from a co-worker that Golinski was bragging that she was going to fire Plaintiff and Ed Gaspar, two of the oldest CRNAs employed at Beaumont –Grosse Pointe. As reported to Plaintiff, Eric Reim told other employees in the recovery room that there would soon be personnel changes because Golinski was going to terminate the two CRNAs. (Exh 1, Flones, pp 91-3). At this point, Plaintiff was terrified about the potential loss of her job.

She felt that she no choice but to go the Human Resources. She met with Brian Cardeccia, the Human Resources representative and Judy Demario, the administrative director of surgical services. (Exh 1, Flones, p 151). Plaintiff reported to them that Sue Winay, the lead CRNA, had stated that she was "sick of all you hormonal women, it's time we got rid of half you fuckers" and "if I had a nine millimeter, I'd take somebody out." (*Id*; Exh 8). Plaintiff also reported that Golinski had previously asked Plaintiff if she was too old to work 16 hour shifts. (Exh 1, Flones 154).[8]

Little investigation was conducted in response to Plaintiff's complaint of ageist and sexist remarks by management. Cardeccia did nothing and instructed Demario to conduct the

---

[7] If Plaintiff had not received the unwarranted, excessive discipline for allegedly using her PDA to conduct medical research, this would have only been a level one PPI as Plaintiff had not made a medication error in her previous 26 years of employment and this incident was found not to be a gross neglect of duty. (Exh 4, Cardeccia pp 48, 51).

[8] Plaintiff also reported that Golinski was aware and tolerated sexually hostile comments from Earl Auty, another CRNA who referred to the "hard bodies" of young attractive women and referred to a young women as the "hot babe in the preop room." (Exh 1, Flones pp 162-3; 180).

investigation. (Exh 4, Cardeccia p 17) Demario simply asked Winay and Golinski if they had made the remarks. (Exh 4, Cardeccia, p 21). Blindly accepting their denials, Demario took no other steps to talk to possible witnesses. In addition, Cardeccia admitted that he knew that Winay often made inappropriate and threatening  remarks, but still took no remedial action.[9] (Exh 4, Cardeccia, pp 22-3). With regard to Reim's statement, Plaintiff was instructed to talk to him to confirm that he made the comment. Reim did confirm that he did hear about Golinski's plan to terminate Plaintiff and Gaspar from another employee, but would not reveal his source. (Exh 1, Flones, p 182). No further investigation was conduct.

 Demario informed Golinski that Plaintiff had complained to HR about her age discriminatory comments. (Exh 5, Golinski, pp 32-4).

Plaintiff's decision to engage in this protected activity sealed her fate. She was terminated just weeks later. On April 5, 2010, Defendant terminated Plaintiff's employment allegedly for transfusing blood during surgery without the surgeon's authorization on March 29, 2012.

On that day, Plaintiff was the CRNA in the operating room with Dr. Schreck who was performing a total hip replacement. The anesthesiologist assigned to the procedure was Dr. Macon. Also present in the operating room that day was the circulator, Ms. Enjoli Kendell, the surgical assistant, the surgical tech and a representative from the orthopedic company providing the equipment. (Exh 1, Flones, pp 49-50).

Treatment of the patient began with an average dose of Versed and then the spinal anesthesia was placed. The patient also received IV medication during the procedure. While under anesthesia, the patient's blood pressure dropped. In addition, her EKG showed changes indicative of ischemia. Plaintiff gave the patient medication to bring the blood pressure up and

---

[9] Not only did Defendant not take any action against Winay for her sexist and ageist comments as well as her threat of violence, it actually promoted her to charge CRNA after Plaintiff's complaint to HR.

treat the EKG changes. Plaintiff also called Dr. Macon to the room. She arrived a half hour later and confirmed that Plaintiff had taken the proper course of action. (Exh 9; Exh 1, Flones p 65).

During the procedure, the patient lost a lot of blood and continued to have low blood pressure. In fact, Plaintiff discussed the blood loss with the surgeon. After trying medication and fluids, the patient's blood pressure was still low and heart rate was elevated. Based on these factors, Plaintiff determined that the patient required a blood transfusion, which is routine in total hip replacement procedures. (Exh 1, Flones, pp 50, 73).

Plaintiff verbally requested that the circulator order blood. She spoke loudly because the circulating nurse was across the operating room.[10]  This was not an unusual request as CRNA is the individual monitoring blood pressure, heart rate and blood loss and thus in the best position to know when blood may be needed. Such a request is also within the CRNA's spectrum of practice. (Exh 10, Repp, p 25, Exh 2, Schreck p 21). If the surgeon objects or disagrees, he or she will overrule the CRNA's call for blood. (Exh 10, Repp, pp 25-6). Schreck did not object or overrule Plaintiff's determination that a blood transfusion was needed here.

 The circulating nurse then ordered the blood. When the blood arrived, the runner knocked at the door and Enjoli, the circulating nurse, announced the arrival of the blood. (Exh 1, Flones, p 209). Plaintiff and the nurse then verbally confirmed that the blood was correct by comparing blood type, name, expiration date and unit number (Exh 12, Kendell, p 16-7). Prior to the transfusion, the circulating nurse signed the required form confirming that the surgeon

---

[10] The surgeon, however, was less than 3 feet away as Plaintiff was standing at the head of the patient and the doctor was at the hip. (Exh 1, Flones p 206). The surgeon can see Plaintiff from where she is standing during the procedure.(Exh 10, Repp, p 33). Although Schreck claimed that he could not see Plaintiff over the drape covering the patient, that is only true when Plaintiff was sitting. Here, with an unstable patient, Plaintiff was standing and could be seen and heard.

ordered the transfusion. (Exh 12, Kendell, p 22-23).[11]Plaintiff then hung blood and administered it to the patient. (Exh 12, Kendell, p 19).

As Dr. Schreck was completing the procedure, Plaintiff reviewed the fluids that she had administered during the surgery. At that time, he expressed concern that blood had been transfused. Plaintiff explained why she ordered the blood and that she had informed him during the procedure. Dr. Macon also reported to Plaintiff and Dr. Schreck shortly thereafter while they were involved in the next surgical procedure that Plaintiff had made the correct decision and a need for blood was indicated as the patient's hemoglobin was 10 in the recovery room. (Exh 1, Flones, p75). Nor did the patient have any post-operative complications due to the blood transfusion.

On the next day that Plaintiff was scheduled to work, Golinski and Winay met with Plaintiff. (Exh 1, Flones, p 76). They suspended her and informed her that she could not speak with any of the doctors or other individuals involved.[12] Then she was terminated on April 6, 2010. (Exh 13). In reaching the decision that Plaintiff allegedly acted improperly, neither Golinski nor any other representative from the Defendant spoke to the circulating nurse who indicated that Dr. Schreck approved the blood transfusion (Exh 12, Kendell, pp 9, 22-24).

Plaintiff attempted to grieve her termination internally but was twice denied. That process was generally just a rubber stamp.[13] No independent investigation or review was conducted. No one spoke to the circulator whose document indicates that Schreck approved the blood

---

[11] It is the circulator's responsibility to make sure that the doctor ordered blood, not the CRNA. (Exh 10, Repp, p21). Thus Defendant's repeated claim that Plaintiff failed to get the order signed by the doctor is disingenuous as she would never had tried to get the order. It is the circulator's responsibility to make sure the doctor wanted blood. In this case, the circulator did that (Exh 12, Kendell, pp 22-24).

[12] This is further evidence that the Plaintiff's termination was orchestrated by Golinski. Dr. Schreck indicated that he did not want Plaintiff terminated and simply wanted to open a dialogue. (Exh 2, Schreck, p 37). Plaintiff had the same goal. But both were blocked by Golinski whose goal was not communication but the termination of the Plaintiff.

[13]Defendant did, however, remove the reference to substandard care, in the termination notice since Golinski could not substantiate her allegations against Plaintiff.

transfusion. (Exh 5, Golinski, p 60; Exh 12, Kendell, p 9). No statement was obtained from Dr. Schreck or Dr. Macon who was not aware of the protocol for ordering blood. (Exh 3, Macon, pp 25, 27; Exh 2, Schreck, p 41).   In addition, the Defendant did not even consider Plaintiff's concern that the termination was in retaliation for her complaint of discrimination. (Exh. 4, Cardeccia, p 78).

Defendant reported Plaintiff's termination to the State of Michigan licensing. After review, the state again concluded that Plaintiff did not err and in fact provided appropriate care to the patient and used good judgment. The Defendant's complaint to the state was therefore dismissed (Exh 14).

Following her termination, Plaintiff filed a charge of age discrimination with the EEOC. Upon receipt of a right to sue notice, Plaintiff filed this case alleging age discrimination and retaliation under federal law.

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56*.  A factual dispute is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact is presented if a reasonable jury could return a verdict for the non-moving party. Id.  When evaluating a motion for summary judgment, the facts are to be construed in a light most favorable to the non-moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  Credibility determinations are for the jury. *Wheeler v. McKinley Enterprises*, 937 F 2d 1158, 1162 (6th Cir. 1991). "The judge's function is not to

weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *White v. Baxter Healthcare*, 533 F3d 381, 390 (6th Cir 2008).

## ARGUMENT

**I.**     **Plaintiff presented sufficient evidence to establish a claim of retaliation.**

Plaintiff has alleged that she was terminated in retaliation for her complaints of discrimination in violation of Title VII and the ADEA. Both laws prohibit retaliations where an employee opposes conduct which she believes in good faith is violative of the anti-discrimination statutes. To establish a *prima facie* case of retaliation, Plaintiff must establish that 1) she engaged in protected activity, 2) that the employer knew of the exercise of the protected right, 3) an adverse action was subsequently taken against the employee and 4) there was a causal relationship between the protected activity and the adverse employment action. *Hamilton v. General Electric Corp*, 556 F3d 428, 435 (6th Cir. 2009).

The burden of proof at the *prima facie* stage is "minimal." The plaintiff need only put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Plaintiff has satisfied this burden.

Defendant does not dispute that Plaintiff engaged in protected activity when she complained to HR about the sexist and ageist comments made by her managers as well as her supervisor's tolerance of the sexually hostile remarks of a co-worker. Defendant was obviously aware of the protected activity when it terminated her employment in April 2010.

Plaintiff can also establish a causal connection between the protected activity and the termination. A causal connection can be established in many different ways. No single factor is dispositive. *Nguyen v. City of Cleveland*, 229 F 3d 559, 563 (6th Cir., 2000). Rather the court must consider the totality of circumstances. *Holmwood v. Pontiac Osteopathic Hospital*, 2001

WL 1654775 (Mich App 2001). Courts have refused to limit the analysis to only temporal proximity or direct evidence of bias. *Nguyen, supra.*

In *Farrell v. Planters Lifesavers Co.*, 206 F3d 271 (3rd Cir., 2000) the court reversed a lower court's decision dismissing a retaliation claim for lack of a "pattern of antagonism" or "retaliatory animus." Rather the court found all types of circumstantial evidence to be relevant and probative of the causal connection required between protected activity and adverse action in a retaliation case. In summary, the court concluded that proof of causal connection:

> Is not limited to timing and demonstrative proof such as actual antagonistic conduct or animus. Rather, it can be other evidence gleaned from the record as a whole from which causation can be inferred. As we explained in Kachmar, "it is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of a plaintiff's *prima facie* case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn." *Id.*

Thus the record must be viewed with a "wider lens" to determine if the element of causation is met. In this case, the court failed to examine the evidence presented by Plaintiff with that wider lens, resulting in an erroneous decision to grant summary disposition.

Courts have identified several types of circumstantial evidence which establish causation. In *Cook v. CBS, Inc.*, 47 Fed Appx 594, 596 (2nd Cir., 2002) the court found that proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against plaintiff by a defendant. Other courts have held that "a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee." *Farrell, supra*, at 281.

As the court explained in *Wells v. Colorado Dept of Transportation*, 325 F3d 1205 (10th Cir., 2003):

The causal-connection element of a *prima facie* retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity. If the employee can show that the employer's proffered reason for taking adverse action is false, the fact finder could infer that the employer was lying to conceal its retaliatory motive."

We understand that by considering an employer's proffered reasons for taking adverse action in the causal-connection portion of the *prima facie* case, we are assessing pretext evidence that is typically considered in a later phase of the *McDonnell Douglas* analysis. But we agree with the Third Circuit that evidence of pretext can be useful in multiple stages of a Title VII retaliation claim. See *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3rd Cir., 2000). The Farrell court wrote:

We recognize that by acknowledging that evidence in the causal chain can include more than demonstrative acts of antagonism or acts actually reflecting animus, we may possibly conflate the test for causation under the *prima facie* case with that for pretext. But perhaps that is inherent in the nature of the two questions being asked--which are quite similar. The question: "Did her firing result from her rejection of his advance?" is not easily distinguishable from the question: "Was the explanation given for her firing the real reason?" Both should permit permissible inferences to be drawn in order to be answered.

As our cases have recognized, almost in passing, evidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other. It is enough to note that we will not limit the kinds of evidence that can be probative of a causal link any more than the courts have limited the type of evidence that can be used to demonstrate pretext. (Emphasis added). *Wells, supra*, at 215-7.

Here Plaintiff can establish the causal connection. There is a close temporal proximity between the protected activity and termination. Plaintiff was removed from her position in March 2010 after engaging in protected activity in February 2010.[14] In addition, the explanation for that decision is pretextual. Defendant claims that Plaintiff was terminated for giving a patient blood without the surgeon's order. However, Defendant's own paperwork, as completed by the nurse circulator during the procedure, indicates that the surgeon did in fact order the blood (Exh 11). This nurse, Enjoli Kendell, was the individual responsible for ensuring that Dr. Schreck wanted

---

[14] Brian Cardeccia's notes indicate that the protected activity occurred on March 1, 2010.

the blood transfused. Thus the contemporaneous document alone demonstrates the Defendant's retaliatory motivation. Kendell testified that she would not have completed the form noting the approval if it did not occur. If Defendant was not acting out of retaliatory motive, it would have at least talked to Ms. Kendell and others present in the operating room before terminating Plaintiff or at least in response to her grievance. But no one ever asked her what happened or obtained a statement from her. (Exh 12, Kendell, p 9).

Golinski's retaliatory motive is obvious here. Dr. Schreck, the surgeon in the procedure at issue, did not think Plaintiff should be terminated. He simply wanted a dialogue within the hospital regarding the correct procedures for ordering blood transfusion. Golinski, however, forbid Plaintiff from talking to him. He never provided a statement justifying the termination. She did not speak to the others in the operating room that day or even share with HR or the grievance panel that the circulator had signed a form indicating that the surgeon ordered the blood transfusion. Thus Plaintiff has satisfied each element necessary to establish a *prima facie* case.

Defendant claims that Plaintiff cannot establish a claim of retaliation because she did not engage in protected activity until after she had been subject to some discipline. In fact, Defendant suggests that the "wheels toward her termination were in motion." Admittedly, Golinski had already issued some discipline. However, unlike the cases cited by Defendant[15],

---

[15] In the cases relied by the Defendant, the employee had already been disciplined for the very activity for which they were terminated. In *Clark v. City of Dublin*, 178 Fed Appx 552 (6th Cir 2006) the court found no causal connection because the plaintiff had received nine disciplinary sanctions for the same performance issues that resulted in his termination, most of which were issued prior to the protected activity. Similarly, in *Cox v. Science Applications*, 225 F3d 658 (6th cir., 2000), the court rejected plaintiff's retaliation claim because the complaints regarding management style and the clash with his manager began to come to a head prior to the protected activity. In *Cooper v. City of N. Olmstead*, 795 F2d 1265 (6th Cir. 1986), the court found that an increase in the number of rule violations written in deficiency book after protected activity was not sufficient to establish a causal link. Again that is not the type of evidence introduced by Plaintiff here.

those prior disciplines were for completely different issues.[16] There is no evidence from those prior disciplines that Plaintiff's termination was imminent for some behavioral problems already identified by Defendant.[17] The disciplinary actions imposed by Golinski were for wholly different and unrelated incidents which could not have been anticipated or predicted by Plaintiff when she engaged in protected activity. Thus Plaintiff has satisfied each element of the *prima facie* case.

## II.   <u>Defendant's explanation is pretext.</u>

Once Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to proffer a legitimate non-retaliatory for its termination of the Plaintiff. *Texas Board of Community Affairs v. Burdine*, 450 US 248 (1981). In this case, Defendant contends that Plaintiff was terminated for "repeated errors in patient care." (Defendant's Brief, p 10).[18]

That does not end the inquiry. Plaintiff must be given the opportunity to demonstrate that the explanation provided is pretext. Generally, to show pretext, a plaintiff must demonstrate "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc).

If the trier of fact could question the credence of Defendant's explanation, then summary judgment must be denied. The fact-finder's disbelief of the reasons put forward by the defendant,

---

[16] Although Defendant attempts to call all three incidents – patient errors – that is certainly not the case. The first incident did not even merit discipline. Plaintiff, while not providing patient care, used her PDA to conduct medical research. There was no patient error there. Plaintiff did make a medication error in January. However, the transfusion of blood that led to her termination was not a patient error. In fact, it was within protocol for Beaumont Hospital and the Public Health code as the State of Michigan found when concluding that she had acted appropriately.

[17] In fact, it was the unfairness of these earlier disciplines that led Plaintiff to engage in protected activity.

[18] Defendant also argues that Plaintiff admitted that she violated policy for each of the disciplines received. That is patently false. Plaintiff admitted that there was a policy prohibiting the use of phones for testing or placing calls. (Exh 1, Flones, p 21). She disputed that any rule existed preventing the use of a smartphone for research (*Id*, 25). She also disagrees that she violated policy regarding the transfusion of blood since the hospital records demonstrate that the surgeon agreed to blood transfusion. (Exh 11).

together with the elements of the *prima facie* case, may suffice to show intentional discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147 (2000). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Id*. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. *Id*. "[T]he fact-finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Id*. "Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Id*. Under the logic of *St. Mary's Honor Center* and *Reeves*, to survive summary judgment a plaintiff need only produce enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale.

Plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *White v. Baxter Healthcare Corp.*, 533 F3d 381, 393 (6th Cir. 2008). As the Sixth Circuit recently reiterated, "[o]ne way in which a plaintiff may demonstrate pretext is by showing that the reason given by the employer is ultimately found to be mistaken, foolish, trivial, or baseless." *Brooks v. Davey Tree Expert Co.*, 478 Fed Appx 934 (6th Cir., 2012).

In this case, the discipline issued by Golinski is both mistaken and unreasonable. Starting with the first discipline issued in November 2009, Golinski was intent on disciplining and

discharging Plaintiff rather than resolving issues. Plaintiff used a PDA to research a medical issue while voluntarily sitting with a patient who was alone awaiting a procedure. Plaintiff was not involved in patient care and was not texting, playing games or making telephone calls. Both Golinski and HR representative Cardecci admitted that the use of her smartphone in this context is likely not a violation of policy. Yet Golinski skipped the first step of progressive discipline which is counseling and issued a level one PPI. This unreasonableness of the discipline is furthered evidenced by the fact that another CRNA who was listening to an IPod with headphones on while a patient was under anesthesia was only given an oral counseling. Clearly the discipline to Plaintiff was underserved as she did not violate any rules. But even if warranted, the discipline she received was excessive given the treatment of other employees in similar circumstances.

While Plaintiff does not dispute that she made an error when she initially attached the wrong medication to the infusion pump, the discipline there was also disproportionately harsh because of the earlier decision by Golinski to issue a level one PPI rather than an oral counseling. If Golinski had acted appropriately, this incident which was Plaintiff's first and only medication error in 26 years, would have resulted in a level one discipline.

In addition, Plaintiff's termination for the blood transfusion issue was also unreasonable and pretext for discrimination and retaliation. Defendant's explanation for its actions lack credibility. Defendant alleges that Plaintiff gave a patient blood without the authorization of the surgeon in violation of the Beaumont policy and licensing standards. In fact, the documentation demonstrates that she did have an authorization/order for the transfusion. (Exh 11). In the operating room, it is the circulating nurse's responsibility to ensure that the surgeon has ordered the blood. The circulator in this case fulfilled that duty as set forth on the transfusion record. Yet

no one spoke with Ms. Kendell about the authorization or the events in the operating room that day. In fact, no statements were obtained from any of the individuals in the operating room.

Defendant also falsely asserts that Dr. Schreck complained that Plaintiff's actions in ordering and administering the blood to his patient was outside the standard of care. Dr. Schreck made no such complaint. He simply spoke to Dr. Macon, the anesthesiologist assigned to direct Plaintiff that day, regarding the blood transfusion because he wanted to "talk about the situation." He never filed a complaint against Plaintiff (Exh 2, Schreck pp 35-7, 41). In fact, such a complaint would have been inappropriate as Dr. Schreck believe that ordering blood is within the spectrum of responsibilities of a CRNA. (Exh 2, Schreck, p 21).  Dr. Macon did not file a complaint either. She only spoke briefly to Golinski and did not participate in any discussions regarding Plaintiff's termination. (Exh 3, Macon, p 25). In fact, Dr. Macon does not know the protocol for a CRNA to give blood. (Exh 3, Macon, p 27).

Plaintiff's actions were not a breach of the standard policy at Beaumont, either. CRNA's routinely order and administer blood without an explicit order from the surgeon or anesthesiologist. (Exh 15, Schroeder affidavit; Exh 10, Repp, p 25; Exh 1, Flones, p 168). Defendant also falsely contends that Plaintiff breached licensing standards. Although Defendant reported Plaintiff, the State of Michigan investigation and found that Plaintiff "provided appropriate care to the patient and used good judgment in the matter. As such, the alleged violations of the Public Health Code cannot be substantiated." (Exh 14).

In light of the complaints of discrimination lodged against Golinski by Plaintiff, it is clear that she was motivated by retaliatory animus, not patient safety, as she repeatedly took steps to terminate Plaintiff. [19]Summary judgment, therefore, is inappropriate.

---

[19] Any reliance by Defendant on the honest belief rule should be rejected as that would require that the Defendant made a "reasonably informed and considered decision." *Brooks v. Davey Tree Expert Company, 478 Fed.Appx. 934, 943* (6th Cir., 2012). Here Defendant failed to talk to anyone in the

### III.     Plaintiff has sufficient evidence of age discrimination to defeat summary judgment.

Plaintiff has also alleged that she was terminated due to her age in violation of the ADEA. Defendant has alleged that Plaintiff cannot establish a *prima facie* case because she cannot point to any employees who are similarly situated who have treated more favorably. (Defendant's Brief, p 9). However, that is not an essential element of all discrimination claims. An age discrimination claim can be established simply by producing evidence relevant to and sufficiently probative of age discrimination. *Matras v. Amoco Oil*, 424 Mich 675, 682 (1986); *Wexler v. White's Fine Furniture*, 317 F3d 564 (6th Cir 2003), (criticism of employee's performance which is linked to stereotypes associated with plaintiff's membership in protected category, such as age, constituted direct evidence of discrimination).

Direct evidence has been defined as "actions or statements by the defendant that reflect a discriminatory attitude." *EEOC v. Freedom Adult Foster Care*, 929 F Supp 256, 261 (ED Mich 1996). By this definition, Golinski's comment that Plaintiff was too old to work 16 hour shifts and threat to get rid of two of the oldest CRNAs is sufficient to demonstrate a *prima facie* case of age discrimination.

These comments are probative of age discrimination even if not made in the context of the termination decision. In *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004), a supervisor told an Italian-American employee that there were too many "dirty wops" working at the facility; about two weeks later, the supervisor terminated the employee. *DiCarlo*, 358 F.3d at 412-13. Because the slurs were uttered by an individual with decision-making authority regarding the plaintiff's job, the court held that the statements were direct evidence of national-origin

---

operating room at the time of the incident, including a witness who signed a transfusion record indicating that the surgeon had approved the blood transfusion. No one, other than the one individual with a retaliatory and discriminatory, motive talked to any witness and obtained no statements. The failure to conduct a reasonable investigation defeats any use of the honest belief rule.

discrimination. *Id.* at 416.  See also *Ercegovich v. Goodyear Tire & Rubber*, 154 F3d 344 (6th Cir 1998), (discriminatory statements need not coincide precisely with the particular actors or time frame involved in the claim) and *Reeves*, *supra*, (court may not discount discriminatory statements because they were not made in context of employee's termination). In light of Golinski's comments,[20] Plaintiff has presented sufficient evidence that her suspension and termination was based on her age to create an issue for jury resolution.

As discussed in section 1, Plaintiff can also establish that Defendant's explanation is pretextual. The same analysis applies to the age discrimination claim. Therefore, Defendant's motion should be denied.

## <u>CONCLUSION</u>

Plaintiff demonstrated each element required to establish a *prima facie* case of retaliation. He has also demonstrated that Defendant's explanation for his termination was pretextual. Therefore, Defendant's motion should be denied and this case be submitted to a jury for resolution on the merits.

<div style="margin-left:auto">

PITT MCGEHEE PALMER RIVERS & GOLDEN, P.C.

By: /s/ Beth M. Rivers (P33614)
    Robert W. Palmer (P31704)
    Beth M. Rivers (P33614)
    Attorneys for Plaintiff
    117 W. Fourth Street, Suite 200
    Royal Oak, Michigan 48067
    (248) 398-9800
    brivers@pittlawpc.com

</div>

Dated:  March 29, 2013

---

[20] To avoid liability, Defendant attempts to blame patients and doctors for the actions taken against Plaintiff. However it is Golinski who was responsible for taking the issues to Human Resources and advocating for the discipline issued in each case including the termination. This is particularly true in the case of the blood transfusion as neither doctor involved filed a complaint or participated in any discussions regarding appropriate discipline or the decision to terminate Plaintiff. In fact, Schreck explicitly testified that he did not want or intend to have Plaintiff terminated. The common thread in all decisions was Golinski, who had expressed ageist comments and had motive to retaliate.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was filed with the U.S. District Court through the ECF filing system and that all parties to the above cause was served via the ECF filing system on March 29, 2013.

Signature:  /s/ Kathleen Chisholm
kchisholm@pittlawpc.com