# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA FLONES,

Plaintiff,

Case No. 2:11-cv-14416-VAR-PJK
Hon. Victoria A. Roberts

vs.

BEAUMONT HEALTH SYSTEM d/b/a BEAUMONT HOSPITAL, GROSSE POINTE,

Defendant.

______________________________/

DEPOSITION OF MELISSA FLONES

Taken by the Defendant on Tuesday, July 10, 2012 at Pitt McGehee Palmer Rivers Golden, P.C., 117 West Fourth Street, Suite 200, Royal Oak, Michigan, at 10:10 a.m.

APPEARANCES:

For the Plaintiff: MR. ROBERT W. PALMER P31704
PITT McGEHEE PALMER RIVERS GOLDEN, P.C.
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 389-9800
rpalmer@pittlawpc.com

For the Defendant: MR. JOHN P. HANCOCK, JR. P23653
BUTZEL LONG
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 225-7000
hancock@butzel.com

REPORTED BY: Ms. Julie DuCoin, CSR-4216, RPR
Certified Shorthand Reporter
(810) 231-0800

phone playing games or texting. Is that what you were told that she complained about?

A. I was told basically that, yes.

Q. And during this period, were you on your phone?

A. I was on my -- using my handheld computer to look up a reference.

Q. And did that reference have anything to do with that patient?

A. No, it did not.

Q. And do you know why the patient was upset about that, about your being on the computer?

A. She didn't say anything to me, no.

Q. The next paragraph says that there's a policy that says that Surgical Services Anesthesia Department Rules and Corporate Communications regarding no personal cell phone use or texting is allowed in the patient care area.

Do you see that? That's the third paragraph down.

A. Uh-huh.

Q. Were you aware of that?

A. At the time -- I was at the time I heard the complaint. I think prior to that, it wasn't well known.

Q. And what were you supposed to be doing at that point with the patient?

A. Nothing.

Q. Were you in the same room with her?

A. I was in the room with the patient.

Q. If you were required to do nothing, why were you in the same room with her?

A. I actually remember this lady very well, not her name, but I remember the incident, because Dr. Macon and I both talked to the patient in the pre-op area beforehand. So we did talk to her about anesthesia, and we explained it. I heard Dr. Macon talking to her, and I also spoke to her.

The endoscopy nurse, I don't remember who it was, put the patient in the endoscopy room, and they walked out and left her because the doctor wasn't available for a period of time. And so I went in the room, and I kind of felt sorry for the patient being in the room with all these scopes hanging there. And I went and sat down, and I said, you know, that the doctor was delayed but that I would sit quietly with her while we waited, and that's what I did.

Q. And were you on the phone while the patient was in the room?

A. I wasn't on the phone; I was using my reference, my handheld computer.

Q. And what is your handheld computer?

A. Well, it used to be a separate device from a phone, but that device broke over time. It was no longer functioning. So with the new phones, it became possible to put my references in one device.

Q. So it was also a phone?

A. It was also a phone, yes, it was.

Q. And you were using that while you were in the room with the patient?

A. She was on a stretcher here (indicating), and I was sitting several feet away from her on a chair.

Q. And what were you looking up on that?

A. I was looking up -- I actually remember what I was looking up, because I had a friend whose son had -- started having seizures, and she told me the nature of what the -- the name they gave her, and I looked up the name of that seizure, because I had never heard of that.

Q. So, again, this was unrelated to --

A. It was unrelated to the patient, yes.

MR. PALMER: Make sure he's done with his question before you answer, and answer the question he asks you.

THE WITNESS: Okay.

BY MR. HANCOCK:

Q. So, again, what you were doing was totally unrelated to the patient you were in the room with?

A. Yes.

Q. Now, do you know who wrote this document, Deposition Exhibit No. 1?

A. I would assume Mary Golinski.

Q. And in this, Mary indicates, if that's who wrote this, that they have conducted numerous staff meetings and had personal

Is that true?

A. That's true. However, it wasn't actually during a case. We were not -- I was not actually engaged in delivering any sort of care other than sitting in the room at the time.

Q. I understand that. But my question is did you confirm to Mary that you had knowledge of this rule and that you admitted to using your phone while caring for the patient --

A. Yes.

Q. -- thus breaking the rules?

A. I admitted to using the reference.

Q. And at that point, it also says that: The rule was re-emphasized with Melissa and she noted understanding of that?

A. Yes.

Q. You were then put on a Performance Improvement Plan as a result of Deposition Exhibit No. 1?

A. Yes.

Q. And I'm assuming that you did not grieve this disciplinary action?

A. I didn't.

Q. And that you had confirmed that you had violated the rule to Mary?

A. I did.

Q. That's true?

A. Yes.

Q. Did you suffer any loss of pay or benefits as a result of Deposition Exhibit No. 1?

A. No.

Q. But you were warned that any further instances result in additional disciplinary action including termination?

A. I don't think she said that, but she has said at meetings, that nature, that --

Q. It does say: A failure to show improvement and maintain this improvement may result in progression to a Performance Management Plan?

A. (Witness nods head affirmatively.)

Q. What is a performance management plan, if you know?

A. I --

MR. PALMER: Don't guess.

A. No. Level II. I guess it would be Level II PIP, but that's all I would guess.

MR. PALMER: Don't guess.

THE WITNESS: Okay.

BY MR. HANCOCK:

Q. And at the bottom of Deposition Exhibit No. 1, there's a Comments Section. Is that what you wrote in?

A. Yes, it is.

(At 10:39 a.m., Exhibit 2 marked.)

BY MR. HANCOCK:

Q. Handing you a document that's been marked as Deposition

Exhibit No. 2. And could you identify that for me, please?

A. It says Plan for Improvement of 2-1-2010.

Q. And could you tell me -- and the date on this is January 5th, 2010?

A. Yes, sir.

Q. And do you know who filled this document out?

A. I believe Mary Golinski.

MR. PALMER: Where is the January -- oh, date of occurrence?

THE WITNESS: Occurrence, yes.

MR. PALMER: Sorry.

BY MR. HANCOCK:

Q. And could you tell me what happened in this incident that resulted in this disciplinary action?

A. Yes. I was at the end of a day. I know it was a 12-hour day, because it was dark out, and it was after seven. And at the end of the day, I was asked to go up and do an epidural with Dr. Haas.

Q. Doctor who?

A. Haas.

Q. How do you spell that?

A. I think it's H-A-A-S, is that his name? The first day I worked with him.

Q. He was a new physician for the hospital?

A. New anesthesiologist. And we went up, and he placed the

the attending anesthesiologist; is that correct?

A. Not exactly.

Q. How was it determined you had hung the wrong bag?

A. Dr. Haas asked me how much Fentanyl was in the bag. I responded that it was a brand new bag. Previous to that occasion, we had always added Fentanyl ourselves to the bag, because we didn't have premixed bags. So I said, "This is a brand new bag. Let's take a look at it so you can see it. Let's look at it together," which is my practice.

If anybody asks me, "What was that that you just gave," I will show them the amp or the syringe or whatever so that we can look at it together. So it's just my practice. So I opened up the pump, which he didn't even have a key for, and we looked at the bag and realized that it was the incorrect bag.

Q. Now, the document goes on to say that the infusion was programmed and had begun?

A. It had just begun.

Q. So had he not asked that, there was no reason for you to go back and look at it; correct?

A. There was a reason for me to go back and look at it.

Q. But you didn't until he asked?

A. Didn't have time.

Q. You had already started it, the program had started, you had already hung the wrong bag?

Q. And you were put on notice by this document that that's what was expected of you, and they did not expect any drug errors or other administration errors in the future; correct?

A. Correct.

Q. You do not have the authority to administer anything without a doctor's order; do you?

A. Not exactly. We do have a lot of, I'm looking for the word, flexibility in the operating room. We routinely administer a lot of drugs that aren't specifically ordered. We administer fluids, IV fluids.

Q. You just do that without anybody telling you to do it?

A. We discuss a plan of action beforehand very briefly.

Q. When you say "we," who are you referring to?

A. The anesthesiologist and the nurse anesthetist. Sometimes it's as simple as this will be a general anesthesia or a spinal anesthetic, and then I commence to administer the drugs without specific discussion of how much and what to use. So --

Q. But you have a doctor's approval?

A. Yeah. I think it's partly because of a long history of working with a group of people. They know how I deliver anesthesia.

Q. Was there a written order for an epidural here?

A. No, I don't know. I never --

Q. Did you check?

Page 41

**A. I don't put the epidural in. We're just --**
Q. You just hang the bag?
**A. I go and assist the anesthesiologist with that.**
Q. The anesthesiologist is actually the one who administers the fluids; is that correct?
**A. He puts the epidural in, and that's his -- I think he signs the order -- actually he signs it usually after the fact, after he's done the epidural.**
Q. But it's his decision -- he could tell you, "I don't want this. I want something different"?
**A. There's a couple choices of drugs.**
Q. And he's the one who's in charge of administering?
**A. Right. Correct.**
Q. Now, did you grieve your one-day suspension?
**A. No.**
Q. You understood you were disciplined for making a mistake?
**A. Yes, I did.**
Q. And you did make a mistake?
**A. Yes, I did. I admitted it.**
Q. And a mistake that could have had serious consequences?
**A. I don't know how serious the consequences would be. Dr. Haas said he had another example of that happening, and the patient received an entire antibiotic epidural, and nothing happened.**
Q. But you knew what you did was wrong?

Page 42

**A. I knew what I did was wrong, and I don't know what the consequences could be of the administration.**
Q. And you understood that from that point forward, you were under observation for your administering of drugs and blood and fluids; correct?
**A. From -- yes.**
Q. And you knew that another incident could result in your termination?
**A. I wasn't expecting that.**
Q. But you knew it could happen?
**A. I knew.**
Q. Now, were you aware that Beaumont was required to file a notice with the State because you were suspended?
**A. They notified me.**
Q. Notified you of what?
**A. That they were going to notify the State.**
Q. And did they tell you that they were required to because disciplinary action, time off had been given?
**A. I believe so.**
Q. And were you contacted by the State?
**A. Yes, I was.**
Q. And was there an investigation by the State?
**A. Yes, I believe there was.**
Q. And were you ever notified what the outcome of this investigation was?

Page 43

**A. Yes, I was.**
Q. And how were you notified?
**A. By letter.**
Q. And what did the letter say, if you recall?
**A. I believe it said something to the nature that they found there was no violation of Public Health Policy or something like that, and it was dismissed.**
Q. But you were told that the hospital was required to submit that?
**A. That's what they said to me.**
Q. Did you suffer any impact on your license because of Beaumont's report to the State?
**A. No.**
**(At 11:00 a.m., Exhibit 3 marked.)**
**BY MR. HANCOCK:**
Q. I am handing you a document that has been marked as Deposition Exhibit No. 3, and ask if you can identify that for me, please.
**A. Yes, it says Michigan Health Professionals - Report of Change in Staff Privileges.**
Q. And what was the change in your privileges? Was it the one-day suspension?
**A. I guess -- I haven't spotted it yet. Yes.**
**(11:01 a.m. to 11:08 a.m., recess taken.)**
**BY MR. HANCOCK:**

Page 44

Q. So this was filed, it says at least, in February of 2010; is that correct?
**A. Yes.**
Q. And the investigation occurred after the filing of this; is that right? Did the State talk to you?
**A. Never.**
Q. Were you aware that there was an investigation going on at this point in time?
**A. I was aware that they received a notice of some sort.**
Q. Now, prior to this date, and "this date" being February of 2010, had you ever made a complaint of sexual harassment to anyone at Beaumont?
**A. No.**
Q. Had you ever made a complaint of hostile environment to anyone at Beaumont?
**A. No.**
Q. Had you ever made a complaint of gender discrimination to anyone at Beaumont?
**A. No.**
Q. Had you ever made a complaint about any comments that were made to you that you thought were inappropriate by other staff members at Beaumont?
**A. No.**
Q. So this action that was taken, that is the one-day suspension and the reporting to the State, was taken without

paragraph on Page 2. The next level of the Program for Performance Improvement will be terminated effective April 6th?

A. Yes, sir.

Q. Now, the description on Page 1 of Deposition Exhibit No. 4 says that you administered anesthesia to a patient undergoing a total hip replacement; is that correct?

A. That's correct.

Q. And it said that you administered blood products, packed red blood cells, without consultation or collaboration or orders from the surgeon or from the medically directing anesthesiologist of record.

Do you see that?

A. Yes, I see that.

Q. Now, are either of those individuals Mary Golinski?

A. No.

Q. Was Mary Golinski in the room with you when these events occurred?

A. No.

Q. Who was in the room?

A. The surgeon, the circulating nurse, the surgical assistant, the surgical tech and there was probably a representative of the orthopedic equipment, the hip replacement rep was probably in there. I never thought of him.

Q. How many of those can you give us a name to?

A. I can give a name to Dr. Schreck, I can give my own name, the circulating nurse at the time the blood was given was Enjoli D'Ampart. I can't remember who the tech or the surgical assistant were.

Q. Now, if you know, who made a complaint about your actions in that room on that day?

A. You said if I know?

Q. If you know, who did that?

A. Who complained?

Q. Yes.

A. Dr. Schreck.

MR. PALMER: I don't want you guessing. Do you know he complained was the question.

A. Oh, made a formal complaint?

BY MR. HANCOCK:

Q. Yes.

A. I have no idea.

Q. In the document going further, okay, it says that: This is not the universally accepted mode of practice within the Department of Anesthesia.

So as I understand it, what they're saying is, correct me if I'm wrong, is that you administered blood products without consultation or collaboration. And it goes on to say that that's not the accepted practice in anesthesia. Am I stating that correctly?

A. That's what it says here.

Q. It goes on to say: She made this decision unilaterally.

Now, if you did that, okay, if you administered something without collaboration or consultation or written order and made that decision unilaterally, would that be a problem?

A. Explain unilaterally.

Q. Without consultation, collaboration, you made the only decision.

A. I discussed the blood loss --

Q. No, I'm not asking you -- I'm just asking you if that happened.

MR. PALMER: Listen to the question he's asking you.

BY MR. HANCOCK:

Q. If that happened, if those facts happened, that you decided on your own to administer blood without direction, consultation or collaboration by either the surgeon or the anesthesiologist, is that a problem? And by "problem," I mean is that wrong?

A. I guess yes.

Q. It further says that you did not obtain a hemoglobin level prior to blood administration and, therefore, lacked clinical evidence to support her decision to administer the blood product.

Now, did you get a hemoglobin level?

A. No.

Q. And that's wrong; isn't it? You're not supposed to administer blood without a hemoglobin level; are you?

A. That's not true. Sometimes it is administered without a hemoglobin level.

Q. But in this case you did not have one?

A. I did not have one.

Q. And how do you get a hemoglobin level?

A. You have to draw blood and send it to the lab, and it takes maybe half an hour or so to get it.

Q. And you did not do that?

A. No, sir.

Q. It says: Melissa based her decision to administer blood on visually observed blood loss during the procedure -- there's two durings, during during the procedure and a lowering of the patient's blood pressure.

Is that what you based your decision on?

MR. PALMER: Hold on, hold on. I object to the question, because there's two questions in there, and it assumes facts not in evidence such as that she made the decision, which she's already told you -- well, you haven't asked her about. Your other question was a hypothetical if she did it without this.

BY MR. HANCOCK:

Q. Did you make a decision to administer blood?
A. Yes.
Q. And did you make that decision based upon visually observing blood loss during the procedure and a lowering of the patient's blood pressure?
A. Yes, partially. Uh-huh.
Q. You were not told to administer blood; were you?
A. No, I was not told to administer blood.
Q. There was no written order to administer blood; was there?
A. There has never been a written --
Q. That's not my question.
A. No, there was not a written order.
Q. There was not a written order. Now, apparently someone took offense at what you did, because you got written up. Is that a fair statement?
A. Yes.
Q. And according to this document, the Chief CRNA, the Chief of Anesthesiology, Dr. Alvarez, and the medically directing anesthesiologist, Dr. Macon, reviewed the anesthetic record.
Were you aware of that?
A. Only because I --
MR. PALMER: Are you aware that that's what it says, or are you aware that they actually did that?
BY MR. HANCOCK:
Q. Are you aware that they actually did that?

A. No.
Q. And who were the two physicians in there? "In there," I mean in the operating room. Was Dr. Macon the anesthesiologist?
A. Yes, sir.
MR. PALMER: You assumed facts not in evidence. She was the anesthesiologist was question, but your question assumes they were both in there. Macon isn't in there through the whole procedure.
MR. HANCOCK: No, I'm just asking about Mr. Macon.
BY MR. HANCOCK:
Q. Dr. Macon was the anesthesiologist --
A. Of record.
Q. -- of record?
A. Correct.
Q. Was there another anesthesiologist in the room?
A. No.
Q. And Dr. Macon, as I understand, is a female?
A. Yes.
Q. Do you know her first name?
A. Myrtice, Myrtice, M-Y-R-T-I-S (sic.).
Q. Myrtice. Dr. Macon was responsible for the administering of anesthesiology, anesthesia and drugs of that nature; is that correct?
A. Yes.

Q. Now, it says the intra-anesthetic care. What does that mean in the next sentence in the second paragraph? The intra-anesthetic care, do you know what that means?
A. That's a word I've never used. I would ask the person who wrote it.
Q. Going forward, it said that that intra-anesthetic care was found to be substandard in addition to the unilateral decision for blood administration.
Now, who would be in a position to determine whether your decision for blood administration was unilateral or not?
A. I don't know.
Q. Would there be anyone who could make that decision other than the anesthesiologist?
A. The anesthesiologist and the surgeon, I would assume, is what you're implying.
Q. And who was the surgeon?
A. Dr. Schreck.
Q. Those would be the two individuals. Is Dr. Schreck male or female?
A. Male, Paul.
Q. Paul. Those would be the two who could determine, at least in their mind, whether this decision was unilateral on your part?
A. I guess.

Q. Mary Golinski had no knowledge of what was going on in there; did she?

A. No.

Q. Her knowledge would have to come from one of those two individuals; is that --

A. Yes, I would assume. Yes.

Q. And it says that they determined that your anesthetic care or intra-anesthetic care was substandard by all who reviewed, and I'm assuming that's what they were talking about, the anesthetic record; okay?

A. Uh-huh.

Q. Now, the Chief CRNA is who?

A. Mary Golinski.

Q. Chief of Anesthesiology is who?

A. Dr. Alvarez at the time.

Q. The medically directing anesthesiologist is Dr. Macon?

A. Yes, sir.

Q. Is Dr. Alvarez male or female?

A. Male, Julian.

Q. Julian. And what they determined, at least according to this document, is that the patient first received a spinal anesthetic, and I'm paraphrasing this, which lowers the patient's blood pressure; is that correct?

A. Correct.

Q. And that's what happened; correct?

A. Absolutely. Yes.

Q. The second thing they state is the patient was given a fairly moderate to large amount of B-E-N-Z-O-D-I-A-Z-E-P-I-N-E and then in parenthesis Versed.

Is that true?

A. To complete the sentence, it said after the spinal anesthetic was placed, and that is not true. The Versed was given before the spinal was administered, and Dr. Macon even asked how much I had given, and kind of with an eyebrow raised that the patient was still awake and was still looking pretty alert.

Q. Regardless of the timing, the question I asked you was that patient given a fairly moderate to large amount of Benzodiazepine (Versed)?

A. The patient was given an average dose of Versed before the spinal was placed.

Q. When you say "average," is that fairly moderate to large amount?

A. I'd say it was moderate.

Q. And that contributes to hypotension?

MR. PALMER: Wait a minute. What contributes to hypotension, if you give a fairly moderate to large, or if you give a moderate amount?

MR. HANCOCK: It says fairly moderate to large.

MR. PALMER: She's taken issue with that.

MR. HANCOCK: Well, she said moderate, fairly moderate. She picked the one first. There's a range in here. It says fairly moderate to large amount. She said it was moderate.

MR. PALMER: But your question is is the amount that she gave, regardless of how she quantifies it, would that lead to hypotension?

MR. HANCOCK: Yes.

MR. PALMER: Not what's written?

MR. HANCOCK: No. She identified what she gave.

BY MR. HANCOCK:

Q. And my question is did that moderate amount contribute to hypotension?

A. No, because the blood pressure didn't drop when I gave it. It dropped after the spinal.

Q. It says: Will also contribute to hypotension.

Does it also contribute to it?

A. Not usually significantly.

Q. What is hypotension?

A. Lowering of blood pressure.

Q. So they being the individuals, the anesthesiologists who reviewed this, are attempting to say here, and correct me if I'm wrong, that two different things had been given to the patient, a spinal anesthetic and Versed, which contribute to lowering of blood pressure; is that correct?

MR. PALMER: My only objection to quantify that is assuming that it's accurately reported what they found. You're saying as reported here.

MR. HANCOCK: Yes.

MR. PALMER: You can answer the question.

A. That's what it says here.

BY MR. HANCOCK:

Q. Both of them would, in normal circumstances, contribute to lowering of blood pressure; is that correct?

A. Versed doesn't usually lower the blood pressure significantly, and it didn't when I gave it.

Q. So you disagree with them on that?

A. Yes.

Q. Down below, it said in addition to the Benzodiazepine, the patient was given additional it just says four narcotics, I'm assuming --

A. IV, IV.

Q. IV, okay. IV narcotics, Fentanyl and Dilaudid.

Was that true?

A. Yes, sir.

Q. It also states in here that those two drugs contribute to hypotension; is that correct?

A. They sometimes can.

Q. And so when they say will also, that is correct, it will, in some instances, contribute?

A. It may.

Q. The patient was also placed on Propofol continuous infusion. What's that?

A. That's a hypnotic, something to help the patient sleep or snooze during the procedure, so that they'll remain still.

Q. It put them in a sleeplike trance?

A. Yes.

Q. And it states next that this is a known myocardial depressant, which will also contribute to hypotension.

Is that correct?

A. Dose-related, it can contribute.

Q. So we now, at least according to this document, have administered four drugs that will and could contribute to lowering of the blood pressure?

A. That may. You said will; I said may contribute.

Q. I said will or could. If I rephrase it, they all could --

A. Yes.

Q. -- contribute to low pressure; is that correct?

A. It could be, correct.

Q. It said: The patient was then placed on a Vasopressor. Two were actually given.

What's that?

A. A Vasopressor is a medication that will bring up the blood pressure, correct the low blood pressure.

Q. And it further says: Two were actually given.

A. Uh-huh.

Q. What two were given?

A. Ephedrine and Phenylephrine.

Q. Why were they given?

A. To raise the blood pressure.

Q. Why were the other previous three or four drugs given? What was the purpose of those?

A. The purpose of those --

MR. PALMER: Discuss them one at a time.

BY MR. HANCOCK:

Q. The spinal anesthetic, why was that given?

MR. PALMER: Spell the last two when you get to them for the court reporter, if you don't mind.

BY MR. HANCOCK:

Q. What was the purpose?

A. The Vasopressors?

Q. No. Start with spinal anesthetic, why was that given?

A. Spinal anesthetic was given, that was the primary anesthetic for the surgical procedure. That would make the patient insensible to pain from the waist or so lower so that the hip could be operated on without the patient feeling it.

Q. And was there a written order for that?

A. No, there's not a written order. The anesthesiologist administers that.

Q. Do you know if he had a written order?

MR. PALMER: She.

MR. HANCOCK: She.

A. I don't think they write an order for that. That's part of the anesthetic plan. It's indicated on the --

BY MR. HANCOCK:

Q. She made the determination to give it --

A. Oh, yes.

Q. -- the doctor?

A. Yes.

Q. And she directed you to prepare it?

A. I don't prepare it; she does.

Q. She did that herself?

A. Yes.

Q. Go to the next one where we have the Benzodiazepine and Versed and the spinal anesthetic.

A. Uh-huh.

Q. Who administered those and made the decision on that?

A. I gave the Versed before the spinal was given, which is routine, and the anesthesiologist gave the spinal.

Q. And who told you to administer the Benzodiazepine?

A. The Benzodiazepine, Dr. Macon has never told me to give it. It is presumed I will give it. It's routine. Every single case we give a little bit of Versed. We give Versed before the spinal is given.

Q. That's part of the knocking the patient out, so to speak?

A. It's part of just preparing the patient so they can be comfortable during the spinal procedure.

Q. And the next two, if you can spell those two?

A. Which one, the --

MR. PALMER: Fentanyl and Dilaudid.

A. Fentanyl, F-E-N-T-A-N-Y-L.

BY MR. HANCOCK:

Q. And what is that?

A. That's a narcotic, short acting.

Q. And who gives that?

A. I did. And Dilaudid, D-I-L-A-U-D-I-D, that's a narcotic, it's long-acting.

Q. And whose decision was it to give that?

A. My decision.

Q. And who told you to give that?

A. Nobody told me to give that.

Q. Do you know if there was a written order for that?

A. Those are not -- I do not get written orders for those. Written orders don't exist for those.

Q. That's part, again, as you're saying, of the anesthesiology process?

A. The anesthesia process, yes.

Q. And the next one is the patient was then placed on --

A. Propofol, P-R-O-P-O-F-O-L.

Q. And who administered that?

A. I did.

Q. And is that a normal part of the practice?

A. Absolutely.

Q. And No. 4?

A. The vasopressors.

Q. Who gave those?

A. I gave those, and they were Ephedrine, E-P-H-E-D-R-I-N-E.

MR. PALMER: I'm sorry, one more time.

A. Ephedrein, E-P-H-E-D-R-I-N-E, and Neo-Synephrine otherwise known as Phenylephrine, Neo, N-E-O, I can't spell out loud, S-Y-N-E-P-H-R-I-N-E.

BY MR. HANCOCK:

Q. And who made that decision?

A. I made that decision.

Q. Now, apparently the physicians felt you gave too much, and this was inappropriate care. That's what the next line says?

MR. PALMER: Read the next line before you answer any question.

BY MR. HANCOCK:

Q. It was felt by the physician anesthesiologist and the Chief CRNA that this was inappropriate care and too much sedation was administered.

A. That whole paragraph is incorrect.

Q. But that was their opinion?

MR. PALMER: Well, that's what it says.

A. That's what it says.

MR. HANCOCK: That's what I asked.

MR. PALMER: You said that was their opinion. It says that. We don't know if that was their opinion, because there's no foundation other than it's on this document.

A. They said that I gave too much sedation, and then I attempted to correct the situation that I created by administering the potent medication to raise the blood pressure. That is totally incorrect and the record reflects it.

The spinal anesthetic caused the drop in blood pressure, which was severe, and I treated it. I also called Dr. Macon to the room. The patient also had problems with her heart, as evidenced by the EKG showing changes indicative of ischemia. I brought the blood pressure up and corrected the EKG changes. I had called Dr. Macon to the room. Took her 30 to 45 minutes to come to the room, and she came to the room. I showed her had the strip of the EKG with the ST depression. And she looked at the EKG to see that it was no longer in evidence. And I told her what I did, how I treated the low blood pressure. And she said there certainly was EKG changes, and she left the room.

BY MR. HANCOCK:

Q. Now, the document says the physician anesthesiologists,

okay, and I think we've identified those as Dr. Alvarez and Dr. Macon; is that correct?

A. Dr. Alvarez was never in the room. I don't even know if he was working that day. Dr. Macon was there.

Q. Well, it says who read the record.

A. Who read the record, I got you.

Q. And those two were physician anesthesiologists, Dr. Alvarez and Dr. Macon?

A. Correct.

Q. Did Dr. Alvarez or Dr. Macon ever make any statements to you that were inappropriate?

A. They never spoke to me.

MR. PALMER: You're talking about gender --

MR. HANCOCK: Sexual harassment --

MR. PALMER: -- that kind of thing?

I'm sorry, I knew she didn't get what you were asking.

MR. HANCOCK: Thanks.

BY MR. HANCOCK:

Q. Did they ever make any sexual comments to you?

A. No.

Q. Did you ever complain about either of them for anything?

A. No.

Q. And did you ever witness them sexually harassing anyone?

A. Not that I witnessed.

Q. And did anyone ever tell you that either Dr. Macon or Dr. Alvarez was sexually harassing anyone?
A. Well, no. There were -- there's off-color jokes that happened.
Q. I'm just talking about those two individuals.
A. Correct.
Q. And you have nothing of that nature, they didn't tell you an off-color joke, either one of them?
A. Not Dr. Macon, but Dr. Alvarez probably over time.
Q. Do you recall any specific instance?
A. No.
Q. And did you ever again make any complaint about either Dr. Macon or Dr. Alvarez?
A. No.
Q. And according to this document, whether you agree with it or not, those two individuals, at least in the written form here, felt that you had taken inappropriate care?
A. That's what this document says.
Q. And why was the Vasopressor administered?
A. Because the blood pressure dropped too much, and the patient showed EKG changes that, if not corrected, might have resulted in the patient having a heart attack or worse.
Q. So when they say in there -- it says that you then attempted to correct the situation by administering a very potent medication to raise the blood pressure, that would be the

Vasopressors?

A. Yes.

Q. And that is why you administered it?

A. Because, yes, the blood pressure was low.

Q. Now, if you go to the last two sentences of the -- what appears to be the third paragraph?

A. Yes. Uh-huh.

Q. They said the typical treatment in a clinical scenario like this is if hypotension is evident after a spinal anesthetic, fluids and medications to raise the blood pressure are given, not large quantities of sedation.

Would you agree with that?

A. Fluids and medications to raise the blood pressure are given, and I did that. I gave the fluids and the medication to raise the blood pressure.

Q. This, however, says that not large quantities of sedation. Did you give large quantities of sedation?

A. I gave -- I didn't give large quantities; I gave sedation.

Q. And it says the blood pressure must be correct or stabilized prior to sedation medications in such large quantities.

A. I think that large quantities depends on the individual. You know, it's like what is a large quantity for me might not be a large quantity for you. So I gave enough sedation so that the patient would be still for the procedure after I had treated the blood pressure to a satisfactory level. And

secondly --

Q. Let's, if we could, I don't mean to interrupt you, but let's reflect on the statement. Would you agree that the blood pressure must be correct or stabilized prior to sedation medications in such large quantities? And take out the such. In large quantities, would you agree with that?

A. I did do that.

Q. I understand you say you did.

A. Yes, yes. I guess, but large is a subjective --

Q. We're assuming, because it's written there, that that's the hypothetical. I'm simply asking you the blood pressure must be correct or stabilized prior to sedation medications in large quantities?

A. Yes, I guess.

Q. That's true?

A. Working with it the best I can.

Q. And it appears from this statement that, although you may disagree, that the physicians and anesthesiologists, at least, again, just by what's written here, felt that large quantities were given?

A. That's what they wrote. That's what they wrote.

Q. Now, going to the last paragraph --

MR. PALMER: Are we talking about it was felt or background?

MR. HANCOCK: Background.

BY MR. HANCOCK:

Q. It says in there that: Dr. Macon counseled her immediately upon discovering that blood was administered.

A. That's what it says here.

Q. Did she counsel with you?

A. Not exa- -- no, I don't think so.

Q. You don't think so. Is there any reason for Dr. Macon to make that up that you're aware of?

A. I don't know what her reasons are.

Q. I'm just asking have you ever had a problem with Dr. Macon before?

A. Not -- no.

Q. Again, did you ever make any complaints about her, about anything, whether it was sexual harassment, whether it was inappropriate remarks, anything prior to this date?

A. I never complained about her.

(11:45 a.m. to 11:59 a.m., recess taken.)

BY MR. HANCOCK:

Q. So as far as you know, there was no reason for Dr. Macon to make anything up about you or make any false statements about you; is that true?

A. No, I don't think so.

Q. You don't think there was, okay.

A. No, I don't think it's true.

Q. You don't think it's true that she had no reason to make up

a statement against you?

A. She said to me a few weeks before this occurrence that, "Divided you fall," meaning that Mary could take out any one of us because the CRNA groups don't stick together, and their group sticks together.

Q. "Their group" being what?

A. The anesthesiologists.

Q. Now, Dr. Macon is not an employee of Beaumont Hospital; is she?

A. She's an employee of the group. I think that's how that works, although I'm not sure, because when they merged with -- when they became Beaumont, that anesthesia group had to become part of the Beaumont Anesthesia Group.

Q. What is the name of the Beaumont Anesthesiology Group?

A. I have no idea.

Q. That's a group of doctors that contract with the hospital; they're not employees?

A. Yeah, I think so. Yeah.

MR. PALMER: Well, if you know. If you don't know what the relationship is, then don't testify to it.

BY MR. HANCOCK:

Q. So the question was they are a group of physicians that contract with the hospital, they're not employees; is that correct, as far as you know?

A. As far as I know.

Q. And it says in here, again, that: Melissa stated this has always been her practice, that is blood being administered.

Do you read that? Why don't you read that last paragraph, and then we'll talk about it, which starts with background.

A. Are we finished with this other stuff beforehand?

Q. I'm just asking you to read that last paragraph, background or related information.

A. Background or related information --

Q. Just to yourself so you're familiar with it. You don't have to read it out loud.

A. (Witness reviews document.) Okay. I've read it.

Q. Now, did you say that you were unaware of the requirement to collaborate with the medically directing anesthesiologist and/or surgeon prior to administering blood products?

A. I don't think I stated -- said that exactly, no.

Q. Were you aware of that requirement?

A. To collaborate?

Q. Collaborate, yes.

A. We were always collaborating with them.

Q. Were you aware that that was a requirement before administering blood?

A. We don't always speak to the anesthesiologist before giving blood.

Q. But is giving blood a routine part of an operation?

A. Routine part of the total hip replacement, almost routine.

Q. Now, in this document, they indicate on the next page that: The patient's hemoglobin level in the PACU and on POD #1 did not support administration of blood.

Do you know what that means?

A. I never saw the patient's chart after the procedure, but I do know that Dr. Macon came back into the room during the case that followed --

Q. My question to you was do you know what that sentence means? And if you do, please explain what they're saying there.

A. They're saying that the -- yes, I know what -- I can read what that says.

Q. And what does it mean?

A. It says the patient's hemoglobin level did not support administration of blood.

Q. You shouldn't have given blood, according to them?

A. According to the hemoglobin level postop. It didn't clearly -- it didn't indicate need for blood.

Q. And they found in the previous paragraph on -- in that paragraph on Page 1, it says: She did not verbalize understanding that hypotension may have been caused by the synergistic effects of the anesthetic drugs coupled with blood loss or that she should have obtained consultation and possibly a hemoglobin level prior to administering the blood product.

started to explain that.

THE WITNESS: Dr. Macon came into the room during the following case and walked in the room along the wall. I'm behind the anesthesia machine, the surgeon is here (indicating). She walked around the outside of my anesthesia machine and equipment and said that -- told Dr. Schreck that the unit of blood was indicated, that the patient's hemoglobin was ten in the recovery room after the unit of blood.

BY MR. HANCOCK:

Q. Now, in the last paragraph, there is a number of statements about what you did or did not appear to recognize. Do you remember talking to anyone about what happened in that operating room prior to the issuing of this document?

A. I never talked to Dr. Macon.

Q. I said anyone. Did you talk to anyone?

A. Mary Golinski called me into the office with Sue Winay.

Q. And how soon after the operation did that occur?

A. What was the date of surgery?

Q. March 29th.

MR. PALMER: Monday.

A. Yeah, so it was I think my next working day, I think. I don't recall exactly.

BY MR. HANCOCK:

Q. And did Mary Golinski ask you questions at that point?

A. I remember her making a lot of statements.
Q. Did she ask you any questions?
A. I don't remember exactly what she asked me.
Q. And did she ask you if you had collaborated with a surgeon or an anesthesiologist prior to administering blood products?
A. I don't remember what she asked me. I remember her saying certain things about the case.
Q. There's a statement in there that Melissa did not appear to recognize the risk that administering blood products to a patient where it may not have been warranted posed.
A. There's no basis for that statement at all.
Q. Were you aware of the risk?
A. The risks of blood products.
Q. Yes.
A. Yes, I'm aware of the risks.
Q. What are the risks of blood products?
A. There's a lot of risks to blood products. The most basic risks are of contamination in the blood product by, of course, the different strains of hepatitis, HIV, those are really considered minimal risks, because those things are tested for now. There's also other viruses that are in it that can be common and cause a little bit of malaise. There can be transfusion error related to a lab error. There can be other reactions to the patient afterwards. Occasionally

A. Uh-huh. Yes.

Q. And Mary conducted an interview with you?

A. Yes.

Q. So as far as you are aware, those doctors whose opinion are in the record who reviewed the record of administering it were not aware of these complaints, as far as you know?

A. I think they were aware.

Q. But you have no knowledge to that effect, no one's told you that?

A. Well, Eric Reim did actually. He said that he went and told recovery room nurses and then myself that the anesthesiologist told him that Mary was intending to fire me. This was directly after my complaints.

Q. Now, that's the emergency room nurses, that's Mary. Do you have any information that those doctors who issued the opinion and wrote the report or gave the information to Mary to write the report had any information? You have not named any of them being aware of this.

A. No, I haven't.

Q. And who is Eric Reim?

A. He's a co-worker, another CRNA.

Q. And what was the source of his information?

A. As a result of hearing what was said in the recovery room by Eric Reim, I went to HR and brought forth all my concerns about --

Q. My question is what was the source of his information, Eric?
A. Eric says he heard it from one of the anesthesiologists.
Q. Who?
A. He's declined to say.
Q. So you have no idea who said this, and you weren't present when it was said; correct?
A. I was not.

MR. PALMER: And when you use "anesthesiologists," do you mean doctors or nurses or both?

THE WITNESS: Anesthesiologists are Doctors of Anesthesia.

BY MR. HANCOCK:

Q. So you never heard that statement directly and you don't know who said it or allegedly said it?
A. Who said it to Eric?
Q. Yes.
A. Correct, I do not know who said it. He declined to tell me.
Q. And in your grievance, okay, it said that: I also indicate that I heard from other CRNAs within my department that Mary Golinski was going to fire myself and another older CRNA based upon the January 10th medication error.

When was that statement told to you? That's at the bottom of Paragraph 3 of your grievance.
A. That was told to me right before I went to HR with my concerns, so whatever date that was.

Q. I don't know. What date was it?
A. It was in February of the year. I don't -- I didn't write down the exact date. I probably can figure out closer, but I'm sure there's a record in HR.
Q. So you understand that, at least this is a report you allege, Mary is going to fire you for that medication error?
A. Mary didn't say Mary was gonna -- Mary intends to fire me and Ed Gaspar.
Q. What you say, however, is that: Mary Golinski was going to fire myself and another CRNA within my department based upon the January 20th medication error.
Now, were you fired based upon that?
A. I wasn't fired based on that.
Q. And then you go on to say that you admitted that you had spiked the wrong medication bag?
A. Yes, and I had --
Q. Now, who was the other older CRNA?
A. Ed Gaspar.
Q. And how old is Mr. Gaspar, if you know?
A. Oh, I think he might be within a year of my age. I can't remember if he's a year older or younger.
Q. And how long had he been at Bon Secours or Beaumont?
A. He worked at Troy Beaumont and transferred. I don't remember how many years he'd been there.
Q. How recently had he transferred to Beaumont Grosse Pointe?

environment?

A. Yes.

Q. To whom did you complain to about age discrimination?

A. I went to HR with Judy DeMario. I asked her to come with me. She's -- she's always seemed like a pretty fair person, and she was head of the OR. And I didn't feel comfortable involving Mary Golinski, because I felt Mary Golinski was the problem. And I went to HR, and I -- we talked to Brian Cardeccia. And I made -- first of all, I talked about the remarks made -- I don't know if I said what I did first, but I told about the remarks that Sue Winay had made, "Sick of all you hormonal women, it's time we got rid of half of you fuckers," the second one that, "If I had a nine millimeter, I'd take somebody out," those were made within two days of each other. They were made on April 29th and May 1st.

Q. Were you present when they were said?

A. Yes, certainly was, and I was not the only witness.

Q. When were they said?

A. When?

Q. Yes.

A. During the day in the --

Q. What date?

A. April 29th was the "time we got rid of half of you" remark.

Q. What year?

A. That was '09. And then two days later she said, "If I had a

BY MR. HANCOCK:

Q. I am handing you a document, it's Deposition Exhibit 18; okay?

A. Uh-huh.

Q. And these are your notes that you claim you took when?

A. When she said them.

Q. And you were present when both of these statements were made?

A. Yes, I certainly was.

Q. And were these the only two statements that you went to Brian Cardeccia about?

A. No.

Q. What were the other statements?

A. The other issue was my evaluation by Mary Golinski, and I believe that was August 2008, the previous -- a full year before where she asked me was I too old to work 16-hour shifts. And I questioned her about that question. First of all, I hadn't worked in -- sorry, did I say 18 -- 16-hour shifts. I hadn't worked a 16 --

Q. There's no question. You answer my question; okay? I don't want to cut you off, but I want to finish the deposition.

A. Okay.

Q. The question in front of you was what other statements did you complain to Brian about in February of 2010? We've got these two from 2009, okay, and the statement that you

Q. So basically we have four --

MR. PALMER: Hold on one second.

(3:23 p.m. to 3:24 p.m., recess taken.)

BY MR. HANCOCK:

Q. We've got four at this point. And my question is were there any other remarks that you complained to Brian about, Brian being the HR manager there, in February of 2010 other than, "Are you too old to work 16-hour shift," "I want to get rid of the hormonal women," "If I had a nine millimeter, I'd take some of you out of here," and, "Mary Golinski wants to fire you"?

MR. PALMER: And Gaspar.

A. And Gaspar.

MR. HANCOCK: Well, that's not what she said. So --

A. No, me and another colleague.

MR. PALMER: It's in the record.

A. And the only other remarks --

BY MR. HANCOCK:

Q. This is, again, what you complained to Brian about.

A. I'm trying to remember now. The other issue was the sexist remarks made by a colleague, another CRNA, a male CRNA, who said, "Check out the hot babe in preop room --" I don't remember what room it was, and it turned out that was the daughter of another co-worker.

Q. And when was that statement made?
A. I don't remember the date.
Q. Was it made --
A. I did not hear the statement. What I heard was Mary coming into the lounge saying that, "Oh, isn't this funny? So and so made this remark. So I called him and told him that he has to go to HR, because it was overheard by a visitor." His remarks were overheard by a visitor and that HR wanted to talk to him. She thought that was very funny.
Q. So did you complain to Brian about that? That was my question.
A. Right now I don't remember.
Q. So you didn't hear the remark?
A. I heard Mary.
Q. You heard Mary say that he made this remark and that he had to report to HR because he said it?
A. Yes, which was not true.
Q. So apparently that -- how do you know he didn't report?
A. Because she let him know she was joking.
Q. Do you know if he ultimately reported?
A. No, because she made that up. It was a joke. She thought it was funny.
Q. And who made the statement?
A. Earl Auty.
Q. Earl Auty. And what was the statement?

Q. And did you make any allegation at any time that you were being treated differently than a younger employee?
A. I didn't, but I think we were. Younger employees didn't receive remarks like that.
Q. Did you make any allegations that you were being treated differently than a male employee?
A. I don't think I said -- no, I don't think there was.
Q. Are you aware of any younger employee who hung incorrect medicine and was not suspended or terminated?
A. I'm unaware of what happens with anybody else.
Q. Are you aware of any male employee who hung incorrect medicine and was not suspended or terminated?
A. I'm unaware of anybody's record, or I'm not privy to other people's actions.
Q. Are you aware of a younger employee who administered blood product that had not been ordered or approved by a physician who was not terminated or disciplined?
A. I think the answer to that is yes, my whole department.
Q. And who specifically gives blood without permission?
A. We routinely -- well, it's an ongoing process in the operating room. We hang blood.
Q. Who specifically who's younger than you?
A. Every CRNA.
Q. Every CRNA, okay. And are you aware of any CRNAs where the doctors, both the surgeon and anesthesiologist, went and

Eric Reim said that Mary Golinski had said she was going to get rid of you?

A. Yes.

Q. Who told you that Eric Reim said that?

A. Cathy Huth and Kathy Kastner.

Q. Did you actually hear Eric say that?

A. No, I did not.

Q. It was hearsay from somebody else?

A. It was hearsay.

Q. And did you ever confront Eric?

A. Yes, I did.

Q. And what did he say?

A. He admitted he made remarks and that he had heard something from an anesthesiologist about the events in OB.

Q. And what did he say he had said?

A. He didn't -- I didn't specifically ask him. It was distressing to me, and I asked him to please -- that I told him that gossip was hurtful, and that I appreciate it if he didn't continue.

Q. So he never told you he heard Golinski say she was going to get rid of you?

A. He didn't say that; he didn't deny it. He told me that he heard it from an anesthesiologist, which he declined to name.

Q. So, again, my question is he never told you that Mary

techs, that's the one who usually knows if they've given irrigation.

Q. Did Dr. Schreck say anything in this discussion? Did he comment on the blood loss?

A. No, he didn't.

Q. Was it obvious to you from his actions that he was listening or paying attention?

A. He always listens. I've never known him not to listen and pay attention to everything. That was his way.

Q. Was anything unusual happening that was causing him to perhaps be panicked or that would cause his attention to be away from what was going on so he wouldn't know what was going on?

A. I think he was experiencing more than the average blood loss.

Q. How long after you talked about the blood loss did you say -- did you verbalize we need -- how did you order the blood? What did you say?

A. I had just talked about what was in the suction and what the estimated -- you know, we were looking at estimated blood loss. And the patient, within five minutes of that, had a significant drop in blood pressure. Heart rate was also going up. And so within five minutes, I think I told -- I asked Enjoli to please call for a unit of blood.

Q. Is that what you said, "Please call for a unit of blood"?

blood bank from where you were at?
A. Yeah.
Q. And then what happens next?
A. Then about -- well, ten minutes or so, I don't remember how long it was, but the -- it's usually ten, 15 minutes the unit of blood arrives.
Q. How does it get there?
A. Someone brings it up to the operating room from the blood bank. So one of the operating --
Q. Did they come in the room?
A. They come to the door. There's no traffic in the -- people don't go in and out of the door. They come and knock on the door and hand it in.
Q. Did you hear them knock on the door?
A. I don't recall. So maybe I didn't. I don't know.
Q. What happened next?
A. Then Enjoli comes over and says, "Here's the blood." And then I --
Q. Now, when she said, "Here's the blood," was she standing in the operating room theater where you and Dr. Schreck were?
A. Oh, yes.
Q. Is there any reason -- does she speak unusually softly? Is there any reason that she would not be heard?
A. She doesn't have a huge voice, but she has a normal tone of voice.