# EXHIBIT 4

# FLONES v. BEAUMONT HEALTH SYSTEM

## BRIAN CARDECCIA

December 11, 2012

*Prepared for you by*



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens

BRIAN CARDECCIA
December 11, 2012

Page 17

1   A.   No.
2   Q.   Did you direct anyone to do anything?
3   A.   Yes.
4   Q.   Who did you direct?
5   A.   Judy Demario.
6   Q.   What did you direct her to do?
7   A.   To speak with Mary Golinski.
8   Q.   About what?
9   A.   The statements that Melissa had indicated Mary had
10       made.
11  Q.   And what was the purpose of her speaking to her about
12       that?
13  A.   To confirm whether or not that had taken place.
14  Q.   Do you know if she ever spoke to Ms. Golinski?
15  A.   Yes.
16  Q.   Okay.  And, what, she told you she spoke to her?
17  A.   That's correct.
18  Q.   I take it you weren't present when she spoke to her?
19  A.   I was not.
20  Q.   And you never spoke to Mary about these statements?
21  A.   No, I did not.
22  Q.   What did Ms. Demario tell you regarding her
23       conversation with Ms. Golinski?
24  A.   She indicated that Mary denied making the comment that
25       Melissa had indicated she had made.


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

BRIAN CARDECCIA
December 11, 2012

Page 21

1   A.   Yes.
2   Q.   Did she talk to Ms. Winay?
3   A.   She indicated she had.
4   Q.   She told you she did?
5   A.   Correct.
6   Q.   Again, you weren't there?
7   A.   That's correct.
8   Q.   And you didn't receive any written report?
9   A.   No.
10  Q.   She told you she had a conversation with Ms. Winay?
11  A.   Yes.
12  Q.   And she probably told you what, Ms. Winay denied it?
13  A.   She indicated a lot of things are said in the surgery
14       area that because of the timeframe that was involved
15       there was not a recollection of that particular
16       statement being made.
17  Q.   Okay.  I take it that part of your duties of your
18       position is being concerned about potential violence
19       in the workplace, right?
20  A.   Yes.
21  Q.   And those type of comments are the type of comments
22       that certainly warrant followup, correct?
23  A.   That's correct.
24  Q.   Did you ever consider talking to Sue Winay yourself?
25  A.   No.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

BRIAN CARDECCIA
December 11, 2012

Page 22

1  Q.  Did you tell Ms. Demario to -- or instruct Ms. Demario
2      to specifically advise Ms. Winay those comments if
3      said were inappropriate, you can't say things like
4      that in the workplace, anything like that?
5  A.  Yes.
6  Q.  Do you know whether or not she did that?
7  A.  I do not.
8  Q.  Okay.  Do you recall Ms. Flones telling you that
9      Ms. Golinski was aware that Ms. Winay had made these
10     comments?
11 A.  Yes.
12 Q.  Did she tell you that those comments were actually
13     made in front of Mary Golinski?
14 A.  No.
15 Q.  How did she tell you that they were aware that --
16     strike that.  It's a terrible question.
17          How did Ms. Flones convey to you what the
18     source was of Ms. Golinski's knowledge that Ms. Winay
19     had made these comments?
20 A.  The reference was that this was a common type of
21     behavior that existed in that department.
22 Q.  Okay.  And that wasn't the first or only time that
23     Ms. Winay had made threatening comments like that,
24     correct?
25 A.  Correct.



BRIAN CARDECCIA
December 11, 2012

Page 23

1  Q.  That this was regular -- I guess that's the way
2      Ms. Winay talked?
3  A.  Correct.
4  Q.  Did you talk to anyone other than directing
5      Ms. Demario to talk with Ms. Winay as to determine
6      whether or not this was in fact truthful, a truthful
7      statement that Ms. Winay did in fact routinely talk
8      like this?
9  A.  Not to my recollection.
10 Q.  Do you know whether or not -- did you ever form that
11     opinion yourself as to whether or not Ms. Flones'
12     statement regarding Ms. Winay was truthful or not or
13     was accurate?
14 A.  I did know of Ms. Winay and it appeared that she did
15     have a tendency of making comments that were
16     inappropriate for the workplace.
17 Q.  Such as the type that Ms. Flones described for you?
18 A.  Correct.
19 Q.  Did you take any remedial action with respect to
20     Ms. Winay's method of talking?
21 A.  Well, it indicated to Ms. Golinski that that type of
22     behavior if known needed to be reported and addressed
23     accordingly.
24 Q.  Did you tell Ms. Golinski that Ms. Flones was offended
25     by it?



BRIAN CARDECCIA
December 11, 2012

Page 35

```
 1   A.   The report didn't come in until sometime in late
 2        November with regards to the incident itself.
 3   Q.   What do you mean the report?
 4   A.   It was -- my recollection is that it was generated
 5        from a patient complaint.
 6   Q.   Okay.  Do you have that patient complaint?
 7   A.   No.
 8   Q.   Would you have had it at the time?
 9   A.   No.
10   Q.   Did you ever see it?  Do you know if one exists or are
11        you --
12   A.   The -- that would come in on information that was part
13        of -- they call it a Press Gainey responses, which are
14        surveys that are sent to patients.  That information
15        would go directly to the manager and director.  HR
16        generally would not have access to those.
17   Q.   Okay.  So in this particular case you didn't see it?
18   A.   Correct.
19   Q.   And when you asked why there was a delay you were told
20        because they had recently received a report?
21   A.   That's correct.
22   Q.   You have no independent knowledge of that yourself?
23   A.   Correct.
24   Q.   Did you, other than changing the form, did you have
25        any other involvement?
```



BRIAN CARDECCIA
December 11, 2012

Page 40

1        facts?

2 A. If there was no direct patient care?

3 Q. Right.

4 A. It would warrant further review of the situation.

5 Q. Okay. When Ms. Golinski came to you, she was seeking to have Ms. Flones written up, correct? She provided you with a plan for performance improvement, right?

8 A. She did.

9 Q. All right. She didn't come to you and just make a conversation describing this, she came to you as an HR person seeking to have Melissa Flones written up on a plan for performance improvement based on this event?

13 A. Correct.

14 Q. Incidentally, in your subsequent conversations with Ms. Flones that you took notes of, did you ever discuss, do you recall ever discussing this first write-up?

18 A. No.

19 Q. Okay. And Beaumont -- or Bon Secours uses a progressive discipline-type approach?

21 A. Yes.

22 Q. So one of the reasons or factors that ultimately was taken into account when Ms. Flones was terminated was the fact that she had this initial level one write-up, correct?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

BRIAN CARDECCIA
December 11, 2012

Page 48

```
 1        your note?
 2   A.   Yes.
 3   Q.   Is there anything else you recall being said by anyone
 4        other than what's reflected in this note?
 5   A.   With relation to the entry on the personal issues, I
 6        do recall that it was referenced to the passing of her
 7        ex-husband.
 8   Q.   And that she was under a lot of emotional strain at
 9        the time?
10   A.   Yes.
11   Q.   Did you, as part of the investigation, seek to
12        determine whether or not there had ever been any other
13        medication errors?
14   A.   No.
15   Q.   Okay.  There's an indication in the write-up that
16        there had not been any previous medication errors?
17   A.   Correct.
18   Q.   Okay.  So apparently that information did come to you?
19   A.   That information was provided by Mary Golinski,
20        correct.
21   Q.   And you knew that Ms. Flones had been there 26 years
22        at that time --
23   A.   That's correct.
24   Q.   -- without any prior medication error?
25   A.   Correct.
```



BRIAN CARDECCIA
December 11, 2012

Page 50

1  A.  That is in relation -- her name would have -- Mary
2      Blain, who was the --
3  Q.  Patient advocate?
4  A.  Yes.
5  Q.  There is some information in here in the second
6      paragraph, it says prior to the medication error the
7      attending anesthesiologist asked Melissa what the add
8      mixture is that we use here and Melissa responded she
9      did not know.  She had already begun the infusion and
10     could not respond what it was she was administering.
11     That's all information that was given to you by Mary,
12     correct?
13 A.  Yes.
14 Q.  Again, you never spoke to any physicians.  So any
15     information you have as to what occurred is
16     information that was given to you by Mary Golinski?
17 A.  In addition to what Melissa had provided to us during
18     her interview.
19 Q.  She didn't tell you this, though, right?  That she had
20     been questioned and didn't know what it was or
21     anything along those lines?
22 A.  Not to my recollection.
23 Q.  So then it must have come from Ms. Golinski?
24 A.  Correct.
25 Q.  There's an indication in here she was asked why she

